FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2015 OCT -9 PM 12:04
CLERK C.Adams
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| DANIEL DEZAUCHE, | * | |
| Plaintiff, | * | |
| v. | * | CV 311-71 |
| GEORGE W. BRYCE, JR.; SOUTHEAST LIGHT SPORT AVIATION, LLC; FLY LIGHT SPORT, LLC; and EASTMAN AVIATION, INC., | * | |
| Defendants. | * | |

## SUPPLEMENT TO THE RECORD AND ORDER

In the above-captioned case, at the close of Plaintiff's evidence, the Court considered Defendants' motion for judgment as a matter of law. Following extensive argument by counsel for the parties, the Court announced certain observations, findings, and conclusions expressing an intention to grant Defendants' motion. Upon reflection, the presiding judge deems it appropriate to announce additional observations and conclusions with respect to the motion. In addition to those stated herein, the findings, conclusions, and observations stated orally from the bench after counsels' arguments upon the motion

1

for judgement as a matter of law are hereby **ADOPTED AND INCORPORATED** by specific reference.

## I. Background

During Plaintiff's opening statement, much was made of the alleged management and control of Aircraft Manufacturing and Design, LLC ("AMD") by Mr. George W. Bryce and his three companies (collectively, "Bryce"). Bryce's dominion over AMD was allegedly achieved through various means, including, in particular, Bryce's manipulation of AMD's accounts receivable and Bryce's delay of payments owed to AMD. Specifically, Plaintiff urged that such conduct resulted in a serious shortfall in AMD's revenue stream that ultimately led to AMD's failure and a takeover by Bryce. Yet, as the Court stated during its oral ruling on Defendants' motion, Plaintiff's evidence was largely, if not entirely, dependent upon conclusory statements, conjecture, and unreasonable inferences. Consequently, because a verdict cannot rest upon "mere speculation and conjecture," this Court could not allow Plaintiffs' case to reach the jury. Pennsylvania R.R. Co. v. Chamberlain, 288 U.S. 333, 344 (1933); see also Anthony v. Chevron USA, Inc., 284 F.3d 578, 583 (5th Cir. 2002) ("[T]he evidence must be sufficient so that a jury will not

ultimately rest its verdict on mere speculation and conjecture."). While conclusory testimony is evidence, juries, like judges considering conclusory affidavits in the summary judgment context, cannot be permitted to find for a party on such evidence alone. See Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir 1997)("Conclusory assertions . . . in the absence of supporting evidence[] are insufficient to withstand summary judgment."); Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985)("[C]onclusory allegations without specific supporting facts have no probative value.").

In the paragraphs that follow, the Court will supplement its oral ruling in two ways. First, the Court will explain how Plaintiff's evidence of Bryce's control of AMD, specifically Bryce's alleged manipulation of the accounts receivable and his delayed payments, was conclusory and uncorroborated. Second, the Court will indicate why each of Plaintiff's causes of action could not survive Defendants' motion.

## II. PLAINTIFF's EVIDENCE OF CONTROL

### A. ACCOUNTS RECEIVABLE

Apart from one document (P-33) identified and offered by Plaintiff upon a proffer clearly demonstrating its

3

inadmissibility, other evidence adduced by Plaintiff to show Bryce's manipulation of AMD's accounts receivable was sparse. Each of the witnesses, Mr. Webster, Ms. Cannon, and Mr. Tiraboschi confirmed that Bryce diverted the billing and payment for AMD's accounts receivable to his own firm, Southeast Light Sport Aircraft, LLC ("SELSA"). (See, e.g., FTR, Sept. 29, 2015, at 9:12 A.M.)[1] However, the witnesses were unable to explain the mechanics or process by which payments were diverted[2], and Plaintiff offered little to no corroborative proof of the conclusory statements of the three witnesses.

More specifically, the testimonies of Webster, Cannon, and Tiraboschi were supported neither by documents, nor by the testimony of any witness outside their former company, AMD. There is no evidence of the amount of any invoice or payment which was diverted away from AMD to SELSA. There is no testimony, document, or corroboration establishing an aggregate amount of invoices so diverted, nor is there even an estimate of the number of bills or customers. In fact,

---

[1] The trial has not yet been transcribed, but the Court is able to listen to the proceedings on an audio recording system, For the Record ("FTR"), and indicate precise time markers.

[2] For example, in response to the presiding judge's inquiry into how this payment diversion occurred, Mr. Webster could only state that "Frank Woodward did some of that." (See FTR, Sept. 29, 2015, at 9:12 A.M.)

4

the only estimate is that work was being done for airworthiness repairs on approximately twenty Zodiac 650 aircrafts over an unspecified period of time.

Furthermore, there is no evidence or corroboration of the months during which these repairs were performed, no identification of particular aircraft, and no <u>exact</u> number of repairs. There is no estimate as to which or how many of the estimated twenty airplanes involved had diverted receivables. Yet, *it is confirmed, without question,* that Bryce's airplanes comprised five of the airworthiness repair projects performed.

While these deficiencies were present at trial, Plaintiff had had more than ample time to explore this area in discovery and has had possession of the company's documents (seventeen boxes thereof as depicted in Plaintiff's exhibit 52) for an extended, unspecified period of time. Nevertheless, the trial record is devoid of any suggestion of discovery into the accounting of SELSA, the billing of AMD, or deposits made by AMD customers to SELSA's accounts.

Overall, with respect to Plaintiff's accounts receivable contentions, the "evidence" consists only of conclusory statements by Webster, Cannon, and Tiraboschi

that, through some means or another, unspecified money was supposed to go to AMD but made it instead to SELSA. Thus, to conclude that this evidence is sufficient to support Plaintiff's claim that Bryce enjoyed operational control of AMD would necessarily authorize the jury to base a verdict upon speculation and conjecture, far beyond a reasonable inference.

### B. DELAYED PAYMENTS

The testimony of both Mr. Webster and Ms. Cannon, somewhat supported by that of Mr. Tiraboschi, included conclusory statements that Bryce purposely and tactically delayed payments on his six aircraft purchases to deprive the company of working capital and the wherewithal to continue its operation. To begin with, the company clearly had <u>no</u> working capital. None of the members of the LLC put any money into a capital account. Rather, the operations of this company were funded from cash deposits received when AMD agreed to sell an airplane not yet built. Then, the kits would be ordered from Canada and assembled at the Eastman, Georgia hangar. The products of this company were individually-built kit planes. Although they were certified to be airworthy, the same kit may be used by individuals to produce an aircraft which is not certified

6

but instead registered as experimental. Thus, the operations of AMD in covering its payrolls, paying its suppliers, and providing for other obligations depended entirely on sales of its single units and repairs.

While there may have been a reasonable profit margin in some of its sales, the company had little leeway or flexibility between the immediacy of its financial needs and the timing of the payments it received from its customers by way of initial deposits and final payments. The typical practice of this company was to require a significant non-refundable deposit from $10,000.00 to $12,000.00 in cash. After receipt of the deposit, AMD would begin the assembly of the kit or construction of the airplane. AMD would then deliver it to the customer upon receipt of the final payment. The final payment was a comparatively large figure, varying according to selected options and any prepayments which may have been negotiated.

Although Ms. Cannon enthusiastically offered her conclusion and opinions that Bryce delayed payments, cross examination revealed that her testimony was based more on result-oriented conjecture than the documents (D71 - D76),

summarized on the chart, Court's Exhibit 2.[3] Yet, it appears that Bryce, despite his alleged close association with AMD, was treated (as to the terms of payment) like any other customer. No testimony nor any document adduced even resembled a plea or demand for earlier payment. In short, there was no corroboration for any assertion or argument that Bryce did anything but pick up and pay for six airplanes when they were scheduled and ready for delivery. The general suggestion of delayed payments by Bryce was indiscriminately sprayed on all transactions without mention of any particular delay on a particular aircraft at a particularly inconvenient time. On the contrary, the documented purchase history of Bryce's six aircraft from AMD demonstrates, rather than deprivation of capital, the sustenance of this company over a period of many months. Bryce provided the business with cash in excess of $575,000 in airplane purchases alone.

Because AMD has not a single unpaid bill or invoice for any portion of an aircraft purchase, since all were delivered, picked up, and paid for in the agreed amount,

---

[3] For example, during direct examination, Ms. Cannon stated that "Mr. Bryce wasn't paying for [his] planes." (See FTR, Sept. 29, 2015, at 10:22 A.M.) However, during Defense counsel's cross examination of Ms. Cannon, it became evident that Bryce paid off each of the six airplanes he purchased within six months, save one that was paid off within eight months. (See Court's Exhibit 2.)

8

the cause of AMD's shortfall in capital requirements and operating funds rests squarely upon the absence of any initial capitalization of the company and no foresight or provision for the funding of AMD's own operating expenses. Vernacularisms such as "shoestring business" and "hand to mouth" come readily to mind. Accordingly, to allow the jury to consider this evidence of "delayed payment" as indicative of a manifestation of Bryce's control would, again, invite the jury to base a verdict on speculation, conjecture, or guess work rather than reasonable inferences from facts established by the evidence.

Moreover, a delayed or withheld payment is less a matter of attempted control and more a matter between seller and purchaser, debtor and creditor. The argued theory that these delayed payments depleted assets or capital is belied by the fact that there was no capital. There was no initial infusion of capital by the members. There was no loan to provide working capital to cover temporary needs for operating expenses. The entire manufacturing enterprise was dependent upon using payments made for the last aircraft sold to fund the construction of the next. There was no evidence of credit or "cushion" of

9

cash in the bank account. Thus, any diminution in sales would fail this company.

### III. PLAINTIFF'S CAUSES OF ACTION

Since the inception of its case against Defendants, Plaintiff maintained a wide variety of claims that continued to metamorphosize until trial. In fact, it was not until just days before trial that the Court received a cogent articulation of Plaintiff's theories of liability. Nevertheless, based on Plaintiff's complaint, his proposed jury charges, his statement of the case, and counsel's remarks at trial, the Court deduced that Plaintiff advanced the following theories: (1) Bryce used AMD as his alter ego, (2) Bryce was a partner with AMD, (3) Bryce was a joint venturer with AMD, and (4) Bryce was a successor to AMD.

#### A. Alter Ego

In Georgia, to establish that a party used an LLC as its alter ego such that the party should be liable for the LLC's debts, a plaintiff must prove the following: (1) the party disregarded the LLC and used it as a mere instrumentality for the transaction of its own affairs; (2) there is a unity of interest and ownership such that separate personalities of the LLC and the party no longer

10

exist; and (3) allowing the party to be protected by the limited liability features of the LLC would promote injustice or protect fraud. <u>Derbyshire v. United Builders Supplies, Inc.</u>, 194 Ga. App. 840, 8440 (1990). Here, Plaintiff's alter ego contention is based more so on theory than it is evidence. To be sure, there are allusions in the testimony of individual witnesses to a conclusion that Bryce assumed dominion over the affairs of AMD. However, the theory and reality are disconnected.

As observed during the oral ruling of September 30, Bryce provided money to AMD. The provision of funds under such a loose arrangement could be construed as a capital investment. However, capital investment does not necessarily constitute an alter ego. In this instance, money flowed into AMD from Bryce, but always through means which respected the separate identity of AMD as an LLC. The money went into AMD's bank account and came out through AMD's established checking account with the signature of AMD member Webster, Tiraboschi, or Cannon. Bryce's purchases of airplanes were routinely handled just as purchases by other customers, notably the one for which we have documentation, that of Mr. Dezauche. Further, to the extent the accidentally-recorded telephone conversation of

11

November 17, 2008, (when AMD was already insolvent according to Ms. Cannon) offers some support for the claim that Bryce intended a takeover, Webster, Cannon, and Tiraboschi—the only formal members of AMD—rejected the amorphous proposal and were determined to carry on as before.

As any suggestion that Bryce exercised dominion and control over AMD is largely conclusory and argumentative, it is abundantly clear that Bryce was in no way officially or formally connected with AMD. The most that could be said for Bryce's interference with or domination of AMD are the following:

> A) By wire transfer, Bryce made deposits of monies sufficient to continue AMD's payroll at a diminished level from November 2008 to July 2011;
>
> B) Bryce provided hangar space to AMD and others during portions of the same period;
>
> C) Bryce maintained a business consultant or management-level employee in an office at the hangar at Eastman, Georgia, during portions of the same period;

D) Bryce had a vital interest in preventing the premature demise of AMD until the airworthiness repairs on his five airplanes were completed; and,

E) The undocumented informality of Bryce's business dealings with AMD is equaled only by that of AMD in the conduct of its own affairs.

### B. Partnership

To prove that a partnership exists such that each partner is jointly and severally liable for the debts of the partnership, a plaintiff must prove the existence of the following: (1) an association of two or more persons (2) to carry on as co-owners (3) a business for profit. O.C.G.A. § 14-8-7. Under Georgia law, factors that indicate the existence of a partnership include "a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital." Aaron Rents, Inc. v. Fourteenth Street Venture, L.P., 243 Ga. App. 746, 747 (2000). However, "the intention of the parties is the true test of whether there is a partnership." Id.

Based on Bryce's November 17, 2008 phone conversation with Tiraboschi, it is clear that Bryce was interested in forming a partnership with at least one of the members of AMD. However, after the other members of AMD became aware of this conversation, all members of AMD rejected a partnership with Bryce and instead continued their existing dealings with him. Because the intentions of the parties is the "true test" as to whether a partnership is formed, no reasonable juror, on these facts, could conclude that a partnership existed between AMD and Bryce.

### C. Joint Venture

To establish a joint venture exists such that each venturer may be jointly and severally liable for the venture's debts, a plaintiff must prove the existence of the following: (1) two or more parties (2) combined their property or labor, or both, (3) in a joint undertaking for profit (4) with the rights of mutual control. Kissun v. Humana, Inc., 267 Ga. 419, 420 (1997). From the testimony of Webster, Tiraboschi, and Cannon, it was clear that the members of AMD did not want to enter a "joint undertaking" with Bryce. Additionally, while Bryce did provide cash advances and hangar space for AMD, there was insufficient evidence—beyond mere conjecture—for a reasonable juror to

14

conclude that Bryce had the right to control the activities of AMD. Had Plaintiff produced more specific evidence indicating that Bryce was directing the employees in the performance of their jobs or making business decisions for AMD, this claim would have been more likely to survive Defendants' motion.

### D. Successor Liability

For a purchasing company to assume the liabilities of a selling company, a plaintiff must prove one of the *following:* (1) there was an agreement between the parties to assume liabilities; (2) the transaction between the parties was a merger; (3) the transaction was a fraudulent attempt to avoid liability; or (4) the purchasing company was a mere continuation of the selling company. <u>First Support Servs., Inc. v. Trevino</u>, 288 Ga. App. 850, 852 (2007). With its case, Plaintiff did not produce sufficient evidence to meet any of these four prongs.

First, no evidence was presented to indicate that AMD and Bryce had an agreement under which Bryce was to assume AMD's liabilities.

Second, Plaintiff submitted no evidence of a *de jure* merger, and Plaintiff failed to present enough evidence for a jury to consider the question of whether a *de facto*

15

merger occurred. In Georgia, a *de facto* merger requires, *inter alia*, that members of the selling company receive stock in the acquiring company. Perimeter Realty v. GAPI, Inc., 243 Ga. App. 584, 593 (2000). Yet, in Plaintiff's case, there was no testimony or documentary evidence suggesting that Bryce had provided AMD's members with shares in one of his companies.

Third, given the evidence produced at trial and highlighted above, no juror could reasonably conclude that Bryce acted in a fraudulent manner so that he, or AMD generally, could avoid the liabilities owed by AMD. If anything, Bryce was wiring money to AMD so that it could stay current with its obligations.

Finally, no reasonable juror could conclude that Bryce was a mere continuation of AMD. A purchasing company cannot be a "mere continuation" of a selling company if the purchasing company does not have the same objects, assets, and members as the selling company. First Support Servs., 288 Ga. App. at 853. While Plaintiff's evidence suggests that Bryce acquired the objects and assets of AMD—no matter how invaluable they may have been—Bryce did not carry with him the members of AMD. As noted above, Cannon,

16

Tiraboschi, and Webster repeatedly declined Bryce's attempts to conduct business as partners, co-members, etc.

### IV. CONCLUSION

For the reasons above, the Court **GRANTS** the motion for judgment as a matter of law as to each Defendant. The Court **DIRECTS** the Clerk to **ENTER JUDGMENT** in favor of each Defendant and against Plaintiff. Plaintiff shall have and recover nothing of these Defendants. With respect to the Defendants captioned above, costs are taxed against Plaintiff and in favor of these Defendants.

Nothing contained herein shall alter or affect the earlier judgments (Doc. nos. 53, 60) entered in favor of Plaintiff and against other defendants Aircraft Manufacturing and Design, LLC, Garry Webster, and Terry Tiraboschi.

Upon the entry of judgment, the Clerk is directed to **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this _9th_ day of October, 2015.

UNITED STATES DISTRICT JUDGE